Good morning, Your Honors. May it please the Court, I'm Mark Mossford on behalf of the appellant, Bonnie Kendall. Your Honors, this case, I discussed it in the briefs, the importance of the background of this case is extraordinary. This is an agency, the Nevada Highway Patrol, is an agency within the Department of Public Safety, and it has a fairly extraordinary history. On February 8, 2002, a report was issued by a ten-person panel appointed by the then Director of the Department, Richard Kirkland, and that report detailed a sexual harassment culture found to exist in the Nevada Highway Patrol. The continuation of that culture was confirmed by a May 2, 2006 report, which comes into the operative area temporarily of this case, which dealt with Captain Jackie Sandage, and that report was authored by one Jeanette Cleaves of the Department of Personnel. And it was a detailed, lengthy report which corroborated numerous, numerous instances of sexual harassment. Ms. Cleaves was deposed by myself in the Sandage case on, I think it was June 17, 2007, or maybe that was the letter. I'm confusing dates. Maybe May. Well, about 35 days after she was deposed, she called me on the phone and asked to appear to see me, and I said, sure. I was a little hesitant. And she came to my door and handed me a five-page written letter, single-spaced, written by one David Badger of the State Department of Personnel, which in my opinion was a direct violation of Title 18, Section 513 and of NRS 199.240, the Witness Protection Acts. Mr. Badger instructed her at length how to change her testimony at trial. Was that the document you handed to Chief Perry during the deposition? I believe so, Your Honor. Okay. And it's not – that's the background, and it's very, very important in this case because Captain Sandage was basically Sergeant Kendall's protégé – mentor. Sergeant Kendall was the protégé. And the remarks made by Lieutenant McAfee were explicitly directed at the fact that Captain Sandage, who was the first Nevada Highway Patrol female captain, had opposed the culture. It all ties together. And in response to that, on a daily or close to daily basis, Lieutenant McAfee was telling Sergeant Kendall some very obscene references that are in the record, the C word and the B word. And so that's the context. And then you have the degeneration between Lieutenant McAfee and Sergeant Kendall, and that happened with Trooper Wine. Now, Trooper Wine is a very formidable man. I describe him as a super male. He's a really tough guy. And he had this status in what they call the Brotherhood at the Nevada Highway Patrol, and he decided that a woman shouldn't be running the academy. Now, Sergeant Kendall built the academy. She built it with state monies, but she selected the building. She put it together. She put her heart into that thing, and everybody knew that. And she was selected by Chief Perry, who was walking the line here. On the one hand, he's a good guy who wants to make some progress. On the other hand, he didn't want to run up against the Brotherhood too hard. And so Trooper Wine directly challenged my client's authority. Now, when a man in a workplace makes a run of the mill, and I'm not denigrating the serious in that, but I've prosecuted over 300 sexual harassment cases, and I've seen a lot of that. I don't know. Let's take an example. Nice-ass baby. Some intrinsically offensive conduct, but it's a co-employee, and it's a remark that is subject to being coped with by being ignored. And as long as the conduct doesn't escalate as unpleasant as it is, there's not a real lot of consequence that goes along with that. You get a situation here where this very formidable guy, a trooper, who has a lot of respect given his size and his strength and the fact he's a defensive tactics instructor, directly challenges openly in the presence of cadets and in the presence of other employees the authority of my client to run that academy. So what does he say? Help me out in terms of the nature of that encounter between your client and Mr. Wine. There was a conflict between them. He came by and he told her that she should stay in her office and look pretty and do what a woman does. And then within 30 hours, it was a day and a half later, in the presence of a number of cadets and other training officers, he told her, I see you're not in your office. And this was after, in response, Your Honor, to the first remark, which was between the two of them, she verbally confronted him and told him his conduct was unacceptable and that he could not use such verbiage in talking to her. And he responded with a laugh and what was described as a flick of the hand. So the conduct had been imposed. Trooper Wine had been placed on notice. And as my client testified in her deposition, at the second confrontation, he drew a line in the sand. And he made it very, very clear that he was going to continue to challenge her authority and continue to insult her in the presence of other cadets and other employees. Is it disputed that he organized a boycott so that further training, not from the cadets but from the established officers, my understanding is that there's some evidence that Wine organizes a boycott so no more training doesn't take place in the academy with established officers? I don't know if it's disputed, Your Honor, but the overwhelming weight of the evidence is that is precisely what happened. And this is summary judgment. Right. And, in fact, that's an interesting aside because Chief Perry, when he learned of what Trooper Wine had done, said there is no defensive tactics unit. There was no defensive tactics unit, per se, that Trooper Wine had authority over. And he was just a trooper. He used the force of his personality to cajole or coerce or whatever he did with the other. They withdrew the in-service personnel who were training at the academy and they withdrew the Nevada Highway Patrol trainers. And they yanked them out of there in direct response to my client opposing this conduct. And after that, Lieutenant McAfee, who sided with Trooper Wine, and when he was ‑‑ when Sergeant Kendall reported this conduct to him, he laughed and attempted to trivialize it. And then when she pursued it and there was a roundtable, and the roundtable is very interesting, Your Honors, because they're trying to say, in effect, that they have the authority to delegate away the duty to investigate and remediate. That's a really interesting argument. I don't think they do. Now, my understanding is that Perry says that she requested the roundtable. Right. She requested the roundtable. He then uses the roundtable as a rationale for not having imposed discipline, saying that, well, everybody understands that a roundtable takes the place of discipline. That is a facile argument, Your Honor, and I'll explain why. That is an absolutely facile argument. I don't know about a facile argument. What evidence is there that sort of contradicts what I just recounted? The reason she elected the roundtable, the reason Sergeant Kendall elected the roundtable, is because Lieutenant McAfee talked her out of complaining formally, and Kimberly King, with the Department of Personnel, discouraged her from complaining. So to go along and get along, she selected the roundtable. It gets worse. Even if we assume the validity of the State's argument that that duty can be delegated, what happened at the roundtable? The roundtable was used as a venue by Trooper Wine to commit. The roundtable became an incident of sexual harassment because he got very angry, he adopted a bullying demeanor, and Chief Perry admits this in his deposition. The roundtable was used as a venue to abuse and to ratify the underlying conduct. So even if we accept the fact that the State could initially delegate the responsibility for resolving this problem to my client, that delegation ended with the roundtable when Trooper Wine put everyone on notice in the presence of Chief Perry that he was an angry, misogynistic guy, he was unapologetic, and it was going to continue. And at that point, even if the duty had been delegated, the duty kicked back in. And then they ratified the withdrawal of the troops, of the in-service personnel and of the trainers. And Chief Perry didn't do anything about that, and the academy ultimately closed in material part because of that, because of the lack of personnel. Counsel, what happened? This was the northern part of the training, in the north? No, this was in the south, Your Honor. Okay. All right. Did the north go on and the south close? Well, this was the DPS academy that was used by a number of different agencies. And that academy, the Nevada Highway Patrol, this facility was superior to any facility of the Nevada Highway Patrol. They used it for the whole of Nevada? Right. Okay. And it was superior to the facility used by the Nevada Highway Patrol. Okay. If you look at the practical effect of that, you've got this history of which Sergeant Kendall was very aware. You've got the calculated attack on her authority. She was placed in a no-win situation. She had no choice but to follow up on this. And then you've got, and then the whole thing is followed up by McAfee's relentless hostility, where he threatened Sergeant Kendall with write-ups, he threatened to transfer her, and he used very, very specific and very foul terms in the context of directly discussing the fact that Captain Sandage was opposing this system. That case settled in the spring of 2000. So he's using, and I'm not even sure I want to say the words, but he's using rather derogatory sexual terms, graphic terms, to describe Captain Sandage? Because she's opposing sexual harassment. It's about as crystalline as it gets. It doesn't get any more crystalline than that. And does McAfee make any comments directed to your client in the sense of saying these words like, you are a so-and-so, or I know that we got in the record that he talks about the size of his sexual organ. I know that we got in the record that he talks about, well, I have to go down to Las Vegas to get my once a week and so on. Right. So I know that's in the record. What else? Is there anything in the record where he calls her your client's name? No. No, Your Honor. I don't believe that's in there directly. But, Sergeant, the only controversial testimony is that Sergeant Kendall was very offended by the direct references to Captain Jackie Sandage. And Lieutenant McAfee was well aware of that relationship. He was very aware. This was not an accident. And that came out on the heels of the opposition to Trooper Wine, of the withdrawal of personnel. And in this, there's another point I'd like to make, Your Honor, before the Court has repeatedly said that you have to consider the totality of the circumstances. You have to consider all of the circumstances. And the circumstances in this case are absolutely devastating because here you have a woman, a strong woman, who, as Chief Perry said, was an excellent employee. And he put her in charge of putting this academy together, and she did a pretty good job. And she's ‑‑ but she's a woman. She doesn't have the upper body strength of Trooper Wine. And so in this context, you have a complete failure to investigate Trooper Wine. And the complaints about Lieutenant McAfee are also admitted. And you have a complete failure to investigate Lieutenant McAfee's conduct. And there's no discipline. And what I would submit is that the failure to investigate in this context, the protracted ‑‑ and then there's this ratification of Trooper Wine's fait accompli, where he just by force of personality, a trooper with no management authority, puts and stages a walkout of essential personnel. It's an extraordinary fact pattern. And Perry would have had the authority to countermand that had he chosen to exercise the authority. Oh, absolutely. You know, you've got two minutes left. Let's hear from the other side, and then you can save those two minutes. Yes, sir. Counsel, I want to know why this is not severe and pervasive. That's what the trial judge said. I wonder why. Okay. Well, that's a very good place to start then. May it please the Court, Sharon Benson for the State of Nevada. In order for a Title VII action to be ‑‑ in order for a Title VII action to persist, you need several things. Verbal and physical conduct of a sexual nature, conduct that has been ‑‑ the conduct has to be unwelcome, and the conduct has to be so severe and pervasive that it alters the conditions of an individual's working environment, which goes to what your question is. The courts have held that key factors in deciding severe and pervasiveness to alter the conditions of a working environment include the severity of the condition, whether the condition was physically threatening or humiliating, and whether it unreasonably interfered with the work performance. Wines, two statements to her, and McAfee's statements to her about another individual do not rise to the level that the courts have stated would cause a severe and pervasive working environment. How about if we add to that what the parties seem to be referring to as the boycott organized by Wine? The boycott, there was some evidence of what Kendall called a boycott. The academy was, and it's disputed, but we will take it as true for this, obviously for a motion for summary judgment, the academy was new, the Southern Academy was new. The Northern Academy had been in existence for a long period of time, and it was the only academy in existence. In the mid-2000s, when the state had a little bit more money, they decided to open up this Southern Academy to try and draw more cadets into the police department or Department of Public Safety. There's a larger population in Southern Nevada. Sergeant Kendall was hired to or chosen to create this academy and put it together. She helped design it. She put a lot of work into it. That's not disputed. All of this was done to open an academy for cadets, which is the main purpose of the academy. Cadet training never stopped. Cadet training continued up until the academy closed due to budget cuts, and that's also not disputed in the record. Budget cuts forced this academy that was short-lived to close. The so-called boycott, if that's the right word for it, organized by WINE, was not with cadets. It was not with the cadets, and that's clear in the record. It was with, I don't know what the right term would be, but active-duty full-fledged officers. Yes, they called it in-service training. Any other agency, I'm not sure. I think there's something like 13 agencies that are encompassed within Department of Public and Safety. But are we supposed to take it as true, meaning there's competent evidence in the record, that indeed the Trooper WINE did act in such a way that the in-service training no longer took place for the Highway Patrol Troopers at the Southern Academy? For the purposes of the summary judgment, yes, the in-service training would not take no longer took place for a period of time. And that WINE did it. I think that was Kendall's allegation, so I will accept that as true for the purposes, yes. WINE did it after this encounter with Sergeant Kendall. Up until the time of this encounter with Sergeant Kendall, WINE was teaching defensive tactics at the Academy. When this happened, he was told to leave the Academy, and he was not allowed to return to the Academy. And then he posted it. Okay, got it. So even with the statements of WINE, two statements on two different days, sit in your office and look pretty and I see you're not in your office, in-service training, which was by all accounts and all the evidence shows a very small percentage, it was not required to take place. It was the Academy was open and other agencies were allowed to use it when there was openings within, when the cadets weren't using the rooms, other agencies like the NHP could use it for their in-service ongoing training. Even if that stopped, even if taking WINE's two statements and even given, I'm sorry, McAfee's statements about his own supervisor, they do not rise to the level of severe impervasiveness. And again, McAfee especially was down, was in Carson City, stationed over 400 miles away from Sergeant Kendall who was down in Las Vegas, and he never made a specific statement to her or about her. All of his statements were about somebody else. He never called her any of these, any offensive name. But it's undisputed for purposes of summary judgment that in her presence, he had these offensive names for Sergeant. For his own supervisor, Sandage. For Sandage. Yes. And it's undisputed that he routinely used sexual words in front of Sergeant Kendall? Well, the, if by sexual words you mean calling her, calling, McAfee calling his supervisor an F-ing B. That he, he. Right. And it's undisputed for purposes that he compares the size of his sexual organ to something that's actually quite large. And that is undisputed for one occasion. He denies it, but we will accept it as true for one occasion. And it's undisputed for our purposes that he says that his sexual relations with his wife aren't very good, so he needs to go to Las Vegas once a week for a BJ. According. That's also undisputed. According to Sergeant Kendall. And we're saying that even with everything that Sergeant Kendall said, it doesn't rise to the level of what was severe and pervasiveness. And I think the district court properly analyzed that and agreed that it's not, that there are few isolated incidents that happened over time from miles and miles and miles away. Is there a different standard for somebody who's working in a Department of Public Safety than someone who's working in a law office? That is to say, if this language were going on in a law office, I mean, this case is over. Is there a different standard in terms of what people get to say to their co-employees in this setting? I think that to answer that question, I would say that while this language is certainly not appropriate for polite conversation, it still does not rise to the level of severe and pervasiveness. It doesn't alter the conditions of your working environment if it's commonplace within the working environment. And I believe that it is commonplace within the working environment within the Department of Public Safety. Are we confined to looking at just wine and back feet, or can we consider this a continuation of a long history of this kind of conduct? I think as a matter of law, you are confined to looking at the incidents that occurred with wine and McAfee. Why is that? The conduct that was described throughout Plano's deposition that occurred other than wine and McAfee had all occurred years prior. The only incidents that she could point to in the last five years at the time of her deposition were the wine and McAfee instances. In order for a court to consider that these past time-barred issues, it needs to be part of the same actionable work environment. It needs to be sufficiently severe and pervasive and the same type of employment action. In this case, those ñ Does it need to be by the same people? That is one of the things to consider, whether or not it's by the same people, whether or not it's the same subject matter, whether or not ñ in this case, they were different people, a different subject matter. She was talking about things that ñ the things that she claimed happened in the 80s and 90s were not things that wine or McAfee had done to her. And you're talking about over 1,000 employees. Let me make my question precise, because I think you and I are on the same page, but I want to make sure. It is not necessarily conclusive if it's a sexual harassment hostile work environment claim that the harassment at different times within the department might have taken place at the hands of different people. That's a factor to be considered. But just because I was working in Department X for three years and my supervisor there gave me a hostile work environment and now I'm working in Department Y and I'm getting a hostile work environment here, that doesn't necessarily make it non-continuous course of conduct that it was in Department X before. I think that in order for it to be ñ in order for that prior Department X conduct to be considered, it needs to be part of that same actual environment. So there needs to be some link. But the link being within the overall Department of ñ Department of Public Safety. That's a very tenuous link when you're talking about over 1,000 people in a department with over 13 agencies. But in other words, the inquiry is going to be contextual. Yes. Yes, it's going to depend on the subject matter, the timing of it, the pervasiveness that it happened before. She's talking about something that happened occasionally or periodically over a 20-year period, and different people, a different place. I think all of those things make ñ all of those things come into play so that as a matter of law, those prior instances should or cannot be considered by the court. However, even if they were to be considered by the court as part of this ongoing environment, again, they were so ñ they were sporadic comments made over a 20-year period by a couple of different employees and I don't ñ they still do not rise ñ they don't change the environment to become ñ they do not make her employment or her environment all of a sudden severe and pervasive. Okay. Now, if we were to hold that within the 300-day period that there was a hostile work environment, if we were to hold ñ you don't have to concede that we ñ I mean, that's the hypothetical. What difference, if any, would it make whether we were to say that it's an open question and to be determined on remand as to whether or not the prior things that she's complaining of was part of the same course of conduct? What difference, as a practical matter, would that make? I think as a practical matter it would not make a difference because, again, these things were ñ that happened sporadically. They were individual comments over a period of 20 years. Would that increase the amount of damage recovery? I don't believe it would have an effect on the damage recovery. So if we find hostile work environment within the statutory period, adding that thing doesn't make any difference to what you have to defend against or what you might have to pay, or rather your asset to your client? I had not considered that question before, but I don't believe it would because, again, it's so ñ  that she was complaining about certain incidents that would ñ that had no link to what she was ñ claiming she experienced. Okay. You're not really answering my question, but okay. Fine. I don't think I can. I don't know how to answer your question. I apologize. That's fine. Any more questions? I think not. Okay. Then I would just like to summarize that the district court did properly dismiss the Title VII action below because it is not implicated by the facts, even with Wine, even with McAfee, even with the boycott, as put forth by plaintiff. Even if everything stated by plaintiff is true in her deposition and in her interrogatories, it does not rise to the level of an actionable claim because it does not meet the severe and pervasive requirement that has been required ñ to alter the conditions of her employment that has been required by this Court. Okay. Thank you. Thank you. You've saved two minutes. Thank you, Your Honor. I'd just like ñ Your Honor asked a question about whether there's a different standard. And if you consider the totality of the circumstances, yeah, there is a different standard. The standard is even higher in this situation because here you're dealing with somebody in a male-dominated environment who's in charge of running this training academy where the adrenaline is flowing, testosterone is there, and she's got to maintain authority. And it's in that context, part of the totality of the circumstances, that this direct attack by this very well-respected, the most physically powerful person on the premises is launched. And part of his job as a trainer at that academy was to maintain the respect of Sergeant Kendall. That was implicit. It's like the implied duty of good faith and fair dealing in a contract. And he deliberately breached that duty. This Court has said that an ambient, hostile work environment exists from manifestation to manifestation. It said that in Draper v. Corps Rochester. The same sort of analysis, I think, applies here. You look at the ñ and you look at the withdrawal. You talk about the terms and conditions. The reason that Sergeant Kendall hesitated to confront Wein more directly and chose a round table, what she hoped would be a conciliatory form of resolution, that reason was she was worried about the interruption of the flow of training at the academy. She didn't want to upset that training. So she chose the conciliatory route. And then what happened? The very thing that she was worried about, the alteration of her term and condition of her employment, the maintenance of good training at the academy was disrupted in a retaliatory manner, which made her job more difficult. Does that constitute an act of hostility? Is that ñ is that a hostile work environment? I think there's only one answer to that question. Thank you. Okay. Thank both sides for their arguments. Kendall v. State of Nevada is now submitted for decision. That completes our argument for this morning. And we now adjourn for the morning. All rise.
judges: Hug, Reavley, Fletcher W.